<u>NOT FOR PUBLICATION</u>

**<u>UNITED STATES DISTRICT COURT</u>**
**<u>FOR THE DISTRICT OF NEW JERSEY</u>**

| | |
|---|---|
| _____ : | |
| DARYL JOHNSON, : | |
| : | |
| Plaintiff, : | |
| : | Civil Action No. 07-3137 (JAG) |
| v. : | |
| : | **OPINION** |
| COMMISSIONER OF SOCIAL : | |
| SECURITY ADMINISTRATION, : | |
| : | |
| Defendant. : | |
| _____: | |

<u>GREENAWAY, JR., U.S.D.J.</u>

Plaintiff Daryl Johnson ("Plaintiff"), pursuant to 42 U.S.C. §§ 1383(c)(3) and 405(g),[1] seeks review of the Social Security Commissioner's (the "Commissioner") decision denying his applications for Supplemental Security Income ("SSI")[2] and Disability Income Benefits ("DIB").[3]  Plaintiff argues that the decision is not supported by substantial evidence, as required by § 405(g), and that the Commissioner erred as a matter of law in denying his

---

[1]  These sections of the Social Security Act (the "Act") provide that any individual may obtain a review of any final decision of the Secretary of Health and Human Services made subsequent to a hearing to which he or she was a party.  The federal district court for the district in which the plaintiff resides is the appropriate place to bring such an action.  42 U.S.C. § 405(g).

[2] Supplemental Security Income is a national program that provides supplemental security income to individuals who have attained age 65 or are blind or disabled.  42 U.S.C. § 1381.

[3]  DIB are awarded only when a claimant with a sufficient number of quarters of insured employment has suffered such a mental or physical impairment that the claimant cannot perform substantial gainful employment for at least twelve months.  20 CFR § 404.1520.

1

application.  For the reasons set forth below, this Court finds that the Commissioner's decision is supported by substantial evidence and shall be affirmed.

# I. PROCEDURAL HISTORY

_____On October 16, 2002, Plaintiff filed an application for Social Security Insurance Benefits. (Tr. 31-33.)[4]  An initial denial was issued on April 29, 2003.  (Tr. 35.)  Plaintiff then filed a request for reconsideration on July 7, 2003 (Tr. 41),  which was subsequently denied on September 26, 2006 (Tr. 43-45).

On March 1, 2004, Plaintiff filed additional applications for SSI and DIB, pursuant to sections 216(I), 223(d), and 1614(a)(3)(A) of the Social Security Act.  (Tr. 278-80.)  Following the denial of Plaintiff's applications on August 3, 2004, and upon denial of reconsideration on April 1, 2005 (Tr. 246-49), Plaintiff timely filed a request for a hearing before an administrative law judge on May 20, 2005.  (Tr. 250.)  Plaintiff appeared before Administrative Law Judge Joel H. Friedman ("ALJ Friedman") on July 7, 2006.  (Tr. 438.)  ALJ Friedman issued a decision on April 26, 2007 finding that Plaintiff was not eligible for DIB or SSI benefits based upon his disabilities.  (Tr. 20-30.)  The following is a summary of his findings:

1.    The claimant met the insured status requirements of the Social Security Act through September 30, 2006.

2.    The claimant has not engaged in substantial gainful activity[5] since January 15,

_____

[4]  The Act instructs the Secretary to file, as part of the answer, a certified copy of the transcript of the record, including any evidence used to formulate the conclusion or decision. 42 U.S.C. § 405(g).  " Tr." refers to said transcript.

[5]  Substantial gainful activity is work that is substantial and gainful. 20 C.F.R. §§ 404.1572 and 416.972.  Substantial work activity is defined as work activity that involves significant physical and mental activities.  Work may be substantial even if it is done on a part time basis, or, even if the individual does less, gets paid less or has less responsibility than when

2002.

3.      The claimant has the following severe impairments: status-post injury to the right hand and effective disorders.

4.      The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR [sic] Part 404, Subpart P, Appendix 1.

5.      The [ALJ] finds that the claimant has the residual functional capacity[6] to perform light work.

6.      The claimant is unable to perform any past relevant work (20 CFR [sic] §§ 404.1563 and 416.968).

7.      The claimant is 39 years old,[7] which is defined as a younger individual (20 CFR [sic] §§ 404.1563 and 416.963).

8.      The claimant has at least a high school education and is able to communicate in English (20 CFR [sic] §§ 404.1564 and 416.964).

9.      The transferability of job skills is not material to the determination of disability because the claimant is not disabled (See SSR 82-41 and 20 CFR [sic] Part 404, Subpart P, Appendix 2).

10.     Based on the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR [sic] §§ 404.1560(c), 404.1566, 416.960(c) and 416.966).  A finding of "not disabled" is directed by Medical-Vocational

---

he or she worked before.  20 C.F.R. §§ 404.1572(a) and 416.972(a).  Gainful work is work activity performed for pay or profit.  Work activity is considered gainful, if it is the kind of work usually done for pay or profit, whether or not a profit is realized.  20 C.F.R. §§ 404.1572(b) and 416.972(b).

    6 Residual functional capacity is an assessment to determine what work activities the claimant can perform despite his or her impairment(s).  20 C.F.R. § 404.1545(a) (2003).

    7 ALJ Friedman found that Plaintiff was 39 years old, which is defined as a younger individual under the Code of Federal Regulations.  This Court notes that as of the date of the ALJ's decision, Plaintiff was 44 years old.  Under the regulations, Plaintiff would still qualify as a younger individual.  See 20 C.F.R. §§ 404.1563 and 416.963 (defining a younger individual as a person under the age of 50).

3

Rules 201.27/28.

11.     The claimant was not under a disability, as defined in the Social Security Act, from January 15, 2002 through the date of [the ALJ's] decision (20 CFR [sic] §§ 404.1520(g) and 416.920(g)).

(Tr. 22-30.)

Based on these findings, ALJ Friedman concluded that Plaintiff was not entitled to a period of disability, DIB benefits, or SSI payments under §§ 216(I), 223 and 1614(a)(3)(A), respectively, of the Social Security Act.  (Tr. 30.)  Plaintiff sought review by the Appeals Council; however, the Appeals Council, in a letter dated June 7, 2007, concluded there were no grounds for review, and that the decision of the ALJ was the final decision of the Commissioner. (Tr. 13-15.)  Pursuant to 42 U.S.C. §§ 1383(c)(3) and 405(g), Plaintiff filed the instant action, seeking reversal of the Commissioner's decision.

## II.  <u>STATEMENT OF FACTS</u>

### A.    <u>Background</u>

Plaintiff Daryl Johnson was born on June 30, 1962.  (Tr. 28.)  He currently lives in Montclair, New Jersey.  (Tr. 440.)  He has at least a high school education and is able to communicate in English.  (Tr. 28.)  After Plaintiff graduated from high school, he had a varied work history.  Prior to 2002, Plaintiff worked as a machine operator/packer/assembler, forklift operator, and escort/security transport driver.  (<u>Id.</u>)  On March 17, 1994, Plaintiff sustained an injury to his right hand due to a work-related incident.  (Tr. 24.)  Between 1994 and 2002, Plaintiff underwent multiple surgeries as a result of the injury to his right hand.  (<u>Id.</u>)  In 2002, Plaintiff stopped working because of complications with his finger which required him to undergo additional surgery.  (<u>Id.</u>)

4

**B.**     **Medical Evidence**[8]

The record indicates that Plaintiff has been evaluated by physicians on several occasions.

1.     Dr. Joseph Barmakian

On August 1, 2002, Dr. Joseph Barmakian, an orthopedic hand surgeon, evaluated Plaintiff.  (Tr. 201.)  Dr. Barmakian stated that a functional capacity evaluation placed "[P]laintiff into the medium category of physical demands according to the dictionary of occupational titles."  (Id.)  Dr. Barmakian opined that Plaintiff "has permanent restrictions which include lifting no more than [thirty] [pounds] and no heavy gripping with the right hand."  (Id.)  Dr. Barmakian opined that these restrictions would not preclude Plaintiff from returning to his job as a bus driver.  (Id.)

On November 3, 2003, Dr. Barmakian noted that Plaintiff was still symptomatic and determined that Plaintiff would be unable to do heavy gripping with his right hand, and would be unable to lift more than 30 pounds.  (Tr. 198.)  An x-ray examination "of the ring and middle fingers [ ] both show good DIP joint arthrodeses which are solidly healed."  (Tr. 197.)

2.     Dr. J. Theodore Brown

On September 11, 2003, Dr. J. Theodore Brown conducted a psychiatric examination of Plaintiff.  (Tr. 168-71.)  Dr. Brown noted that Plaintiff was pleasant and cooperative throughout the evaluation.  (Tr. 169.)  Plaintiff's motor behavior was normal and his eye contact was

---

[8] There is additional medical evidence in the record that the ALJ did not cite.  Some medical records, not mentioned by ALJ Friedman, describe the numerous operations Plaintiff underwent after the injury to his hand in 1994.  (Records from Drs. Asaads and Robert Beasley (Tr. 107-29, 130-152.))  Although ALJ Friedman did not specifically cite the medical findings of these other doctors, this Court notes that the substance of the additional medical evidence in the record corroborates, and is consistent with, the medical evidence utilized by ALJ Friedman in determining the outcome of this case.

appropriate.  (Id.)  Plaintiff's thought process was coherent and goal directed.  (Id.)  There was "no evidence of elusions, delusions, hallucinations, or paranoia in the evaluation setting."  (Id.)  Plaintiff had a "full range of appropriate speech associated with thought content."  (Id.)  His mood was neutral and his sensorium was clear.  (Id.)  Plaintiff's attention and concentration was slightly impaired.  (Tr. 170.)  His memory was impaired and his cognitive functioning was average.  (Id.)  Dr. Brown opined that Plaintiff could follow and understand simple directions and instructions and perform simple rote tasks.

Dr. Brown diagnosed Plaintiff with "[m]ajor depressive disorder, rule[d] out psychotic features[,] [a]nxiety disorder [and] [c]ognitive disorder."  (Tr. 170-71.)  Dr. Brown recommended that Plaintiff be given a medical follow up and evaluation, vocational training, rehabilitation, individual psychological therapy, and psychiatric intervention.  (Tr. 171.)  Dr. Brown provided a prognosis that Plaintiff's condition is fair, assuming that Plaintiff is provided with recommended resources and is compliant with the same.  (Id.)

3.     Dr. Benito Tan

On May 4, 2004, Dr. Benito Tan, a State Agency psychiatric consultant, conducted a residual functional capacity assessment.  (Tr. 388-90.)  Dr. Tan determined that Plaintiff could remember locations and work-like procedures, understand, remember and carry out very short and simple instructions and detailed instructions, perform activities within a schedule, maintain regular attendance, be punctual within customary tolerances, sustain an ordinary routine without special supervision, work in coordination with or proximity to others without being distracted by them, and make simple work-related decisions.  (Tr. 388.)  Pertaining to social interaction, Plaintiff had the ability to interact appropriately with the general public, ask simple questions or

6

request assistance, get along with co-workers or peers without distracting them or exhibiting behavioral extremes, and maintain socially appropriate behavior.  (Tr. 389.)  Dr. Tan also determined that Plaintiff had the ability to be aware of normal hazards and take appropriate precautions, travel in unfamiliar places or use public transportation, and set realistic goals or make plans independently of others.  (Id.)  Dr. Tan concluded that Plaintiff "can understand and remember instructions, can maintain appropriate social interaction and adapt at work."  (Tr. 390.)

       4.    <u>Dr. Marc Friedman</u>

On April 3, 2004, Dr. Marc Friedman, a consultant from the Department of Labor's Division of Disability Determination Services, conducted a psychiatric consultative examination of Plaintiff.  (Tr. 345.)  Dr. Friedman noted that there were signs of psychomotor retardation.[9] (Id.)  Dr. Friedman noted that Plaintiff had no history or previous episodes of depression or psychiatric treatment.  (Tr. 346.)  Plaintiff denies suicidal ideation or intent.  (Tr. 347.)  Plaintiff's "intelligence is estimated to be average [and] [his] [m]emory appears grossly intact." (Id.)  Dr. Friedman determined that Plaintiff had a GAF score of 50.[10]  (Id.)  Dr. Friedman diagnosed Plaintiff as having: "major depressive disorder, single episode;" "status post injury to

---

[9] Psychomotor retardation is defined as "a generalized slowing of motor activity related to a state of severe depression or dementia."  MOSBY'S MEDICAL, NURSING & ALLIED HEALTH DICTIONARY 1429 (6th ed. 2002) [hereinafter "MOSBY'S"].

[10] A GAF scale tracks "the clinical progress of individuals in global terms."  AMERICAN PSYCHIATRIC ASSOCIATION, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS: FOURTH EDITION 32 (Text Revision 2000).  "The GAF Scale is to be rated with respect only to psychological, social, and occupational functioning."  Id.  A GAF scale ranges from 0-100.  Id. at 34.  Generally, a lower score indicates a more serious mental disorder.  A score of 0 stands for "inadequate information," and a score of 100 indicates "[s]uperior functioning in a wide range of activities."  Id.  A GAF score of 50 indicates "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupation, or school functioning (e.g., no friends, unable to keep a job)."  Id.

right hand and osteoarthritis."[11]  (Id.)  Dr. Friedman recommended that Plaintiff undergo

"outpatient psychotherapy and evaluation for antidepressant medication."  (Id.)

Dr. Friedman provided a prognosis that Plaintiff's condition is fair, and stated that

Plaintiff's condition can be expected to last at least one year.  (Tr. 347-48.)

        5.        Dr. Salvatore Milazzo

On June 22, 2004, Plaintiff underwent an orthopedic consultative examination conducted

by Dr. Salvatore Milazzo, a consultant from the Department of Labor's Division of Disability

Determination Services.  (Tr. 349.)  Plaintiff complained of pain and swelling in his fingers and

an inability to make a fist.  (Id.)  Dr. Milazzo conducted a physical examination, and concluded

that due to a grinding accident of his right hand, Plaintiff had "decreased range of motion of the

distal interphalangeal[12] joints of both the ring and middle finger[s] with some swelling and

tenderness over the proximal interphalangeal joint of the middle finger."  (Tr. 351.)  Dr. Milazzo

also determined that Plaintiff had a grip strength of 4+ and did not appear to have

hypersensitivity of the fingertips.  (Id.)

Dr. Milazzo noted that Plaintiff could squat, as well as mount and dismount the

examination table, without difficulty.  (Tr. 350.)  Upon examination of the cervical spine and

thoracolumbar spine, Dr. Milazzo noted that Plaintiff had no appreciable paraspinal muscular

---

[11] Osteoarthritis is defined as "a form of arthritis in which one or many joints undergo degenerative changes, including subchondral bony sclerosis, loss of articular cartilage, and proliferation of bone spurs and cartilage in the joint."  MOSBY'S at 1241-42.

[12] Interphalangeal is defined as existing between two phalanges.  WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY OF THE ENGLISH LANGUAGE UNABRIDGED, 1181 (3rd ed. 1993).

tightness or complaints of pain on palpation[13] or motion.  (Id.)  Plaintiff had no "tenderness over

the gluteal musculature,[14] sciatic notches or sacroiliac[15] joints."  (Id.)  Dr. Milazzo noted that

"in the upper extremities, Plaintiff had functional range of motion of the shoulders, elbows,

wrists and left hand, [and] functional range of motion of the hips, knees and feet, in the lower

extremities."  (Id.)  A radiographic examination of Plaintiff's right hand showed that the bones

were in good alignment, there were mild arthritic changes, and there were no acute fractures or

dislocation.  (Tr. 352.)

> 6.   Mountainside Hospital

On June 28, 2004, Plaintiff went to Mountainside Hospital's emergency room and

complained of back pain and pain in the right third finger.  (Tr. 355, 357, 359.)  A physical

examination of Plaintiff showed old injuries that were healed in the right hand without signs of

infection, as well as minimal tenderness in the spine.  (Tr. 357.)  Plaintiff was diagnosed with

"acute exacerbation[16] of chronic back pain [and] finger pain due to status post previous injury

and surgery."  (Tr. 358.)

---

[13] Palpation is "a technique used in [a] physical examination in which the examiner feels the texture, size, consistency, and location of certain body parts with the hands.  MOSBY'S at 1266.

[14] Gluteal pertains to the buttocks or to the muscles that form the buttocks.  MOSBY'S at 750.  Musculature is the arrangement and condition of the muscles.  MOSBY'S at 1134.

[15] Sacroiliac pertains "to the part of the skeletal system that includes the sacrum and the ilium bones of the pelvis."  MOSBY'S at 1528.

[16] Exacerbation is defined as "an increase in the seriousness of a disease or disorder as marked by greater intensity in the signs or symptoms of the patient being treated."  MOSBY'S at 636.

_____7.    Dr. Sanchez

On July 5, 2005, Dr. Manuel Sanchez from Saint Michael's Medical Center conducted a psychiatric evaluation of Plaintiff.  (Tr. 395.)  Plaintiff complained of a "depressed mood, having no energy, social isolation, feeling useless, and at times feeling he is better off dead."  (Id.)  Despite these feelings, Plaintiff never had plans or intentions to hurt himself.  (Tr. 395, 396.)  Plaintiff informed Dr. Sanchez that he started a methadone program because he began to use heroine in 1998 to relieve the pain in his right hand, but became dependent on the drug.  (Tr. 395.)  Dr. Sanchez noted that Plaintiff had no perpetual disturbance and no delusional thinking throughout the interview.  (Id.)  His speech was clear with a normal rate and volume.  (Id.)  Plaintiff was diagnosed with "[m]ajor [d]epressive disorder, [m]oderate [m]ethadone dependence, [status-post] [h]and [i]njury, [m]edical [p]roblems [and] [e]conomical problems."  (Tr. 396.)  Dr. Sanchez determined that Plaintiff had a GAF score of 60.[17]  (Id.)

8.    Dr. Robert T. Latimer

On August 1, 2005, Plaintiff underwent a psychiatric examination conducted by Dr. Robert T. Latimer.  (Tr. 391.)  Dr. Latimer diagnosed Plaintiff with "Major Depression; Adjustment Disorder; CDS Heroine Abuse for Pain; On Methadone; Injury to Right Fingers; [and] Back Pain."  (Tr. 394.)  Dr. Latimer recommended that Plaintiff receive continued medical and psychiatric care.  (Id.)  Plaintiff was "considered totally disabled as a psychophysiological working unit with a 50% total, permanent psychiatric component."  (Tr. 394.)

---

[17] A GAF score of 60 indicates "[m]oderate symptoms (e.g., flat effect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)."  AMERICAN PSYCHIATRIC ASSOCIATION, at 34.

10

9.     Dr. Ahmad

On May 9, 2006, Plaintiff underwent an examination conducted by orthopedic surgeon

Dr. I. Ahmad.  (Tr. 398.)  Plaintiff complained of "[c]hest pain; shortness of breath; difficulty

breathing; gasping for air at times; hoarseness of voice; keeping a cold; stiffness, pain and

soreness of the neck; pain in the back [that] radiates to the buttocks and legs; trouble bending and

lifting; cannot sit or stand for a long period of time; pain on weather changes; feel[ing] very

morose; depression; feel[ing] despondent; irritation of the nose and throat; nervousness;

irritability; visual and hearing complaints; [and] back pain."  (Tr. 399.)  With respect to

Plaintiff's right hand, he complained that its condition worsened, there was "deformity, constant

pain, sensitivity to the touch, tenderness, pain [that] radiates to the fingers," deformity and pain

in fingers and nails when he rubs them, and swelling.  (Id.)  Dr. Ahmad diagnosed "Spinal

Sprain, Scarring and Ankylosis[18] of the Right Hand, [and] Fusion of the Right, Second and

Third Fingers."  (Tr. 400.)  Dr. Ahmad determined that Plaintiff was totally disabled.[19]  (Id.)

10.     East Orange General Hospital Outpatient Behavioral Health

Records from East Orange General Mental Clinic "showed that the claimant was

diagnosed with bipolar disorder and had a global assessment of functioning (GAF) of 50."  (Tr.

405.)  "His treatment consisted of psychotherapy and psychotrophic medications."  (Tr. 403-04.)

---

[18] Ankylosis is the "fixation of a joint, often in an abnormal position, usually resulting from destruction of articular cartilage and subchondral bone."  MOSBY'S at 102.

[19] This Court notes that the regulations provide that the Social Security Administration ("SSA") is "responsible for making the determination or decision about whether [a claimant meets] the statutory definition of disability."  20 C.F.R. § 404.1527(e)(1).  In doing so, the SSA reviews "all of the medical findings and other evidence that support a medical source's statement that you are disabled."  Id.  "A statement by a medical source that [a claimant is] 'disabled' or 'unable to work' does not mean that [the SSA] will determine that [there is a disability]."  Id.

On November 1, 2005, Plaintiff's records indicated that no "Somatic Concerns, Conceptual Disorganization, Mannerisms [and] Posturing, Grandiosity, Hostility, Suspiciousness, Hallucinatory Behavior, Motor Retardation, Uncooperativeness, Unusual Thought Content, Excitement, [and] Disorientation" were present.  (Tr. 405.)  On June 8, 2006, when Plaintiff was last seen, he did not report experiencing any physical pain.  (Tr. 402.)

**C.     Plaintiff's Testimony at ALJ Hearing**

In the administrative hearing held on July 7, 2006, Plaintiff testified that he last worked in January of 2002 (Tr. 442), due to continued pain from a hand injury that occurred in 1994 (Tr. 448, 452).  He stated that the injury to his hand led to additional problems, such as difficulty focusing and anxiety.  (Tr. 442, 469.)  Plaintiff's present income comes from general assistance welfare, in the amount of $210 per month, plus $129 in food stamps.  (Tr. 443.)

For Plaintiff's depression and anxiety, he takes Buspar, Kolopin, and Pannalar, which are prescription medications.  (Id.)  Plaintiff also takes Methadone for his prior heroin addiction, and over the counter medications for pain.  (Tr. 445, 457.)  He has been clean since April, 2005.  (Tr. 445.)  Plaintiff suffers from dizziness and loss of thought as side effects of the medication.  (Tr. 446.)

Plaintiff last worked in January, 2002 driving handicapped children to and from school.  (Tr. 447.)  He had this job for three years until 2002, when he received treatment for his injured right hand.  (Tr. 448.)  Plaintiff testified that he would be unable to continue driving children because of his anxiety and nervousness.  (Id.)  Prior to his driving job, Plaintiff worked for a visiting nurse association in East Orange, as an escort providing protection and security in bad neighborhoods.  (Tr. 449.)  Plaintiff testified that he would be unable to perform this job now

because of the amount of carrying required, and his inability to deal with conflict situations  (Id.)

Prior to working for the visiting nurse association, Plaintiff worked for American Steel driving a

forklift.  (Tr. 450.)  While there, Plaintiff injured his back.  (Id.)  Plaintiff stated that he would be

unable to do that job because of his nervousness.  (Tr. 451.)  Prior to working for American

Steel, Plaintiff worked at Burley Sparing as a tool and die maker.  (Id.)  While there, Plaintiff

injured his right hand.  (Id.)  Plaintiff had three separate surgical procedures that were conducted

by Dr. Beasly in New York.  (Tr. 460.)  Dr. Barmakian of The Orthopaedic Hand & Upper

Extremity Center treated Plaintiff both before and after his surgery in 2002. (Tr. 201-31)

Treatment included removal of the stitches and pins in his finger as well as  prescription of

physical therapy.[20]  (Id.). After performing the surgery[21] as well as overseeing Plaintiff's  physical

rehabilitation, Dr. Barmakian cleared the Plaintiff to return to work on August 5, 2002.  (Id.)

Plaintiff testified that he feels useless and his average day is depressing.  (Tr. 452.)

Plaintiff stated that he does not socialize, and is unable to participate in hobbies, such as playing

basketball.  (Tr. 453.)  Plaintiff also stated that he does not go out for walks because he cannot

walk far without getting tired and having to sit down.  (Tr. 454.)  He testified that he is unable to

stand and sit for long periods of time.  (Tr. 454-55.)  Plaintiff also testified that he experiences a

lot of pain, especially in the winter.  (Tr. 456.)

---

[20] At the hearing before the ALJ, Plaintiff testified that he was also seen by a Dr. Boyardo around this time (Tr. 460), but no medical records from Dr. Boyardo were included in the record submitted to this Court.

[21]Although Plaintiff testified that Dr. Beasley performed approximately three surgeries, the record indicates that Dr. Barmakian performed a follow-up surgery to at least one of those procedures.  (Tr. 230.)

**D.**  **Testimony of Vocational Expert, Mr. Rocco J. Meola**

Rocco J. Meola testified as a vocational expert at the hearing.  (Tr. 463-69.)  Mr. Meola stated that Plaintiff's jobs as a machine operator and packer or assembler were classified as medium, unskilled work.  (Tr. 465.)  Plaintiff's work as a forklift operator was light to medium and semi-skilled.  (Id.)  Plaintiff's work as a nursing escort was light, potentially rising to medium, unskilled work.  (Id.)  Plaintiff's work as a transport driver was light and semi-skilled.  (Id.)

ALJ Friedman asked Mr. Meola to determine, hypothetically, whether a person would be able to perform Plaintiff's past relevant work, assuming that an individual of Plaintiff's age, education, and past relevant experience could perform simple, routine, low contact light work, with limited use of his right hand for fingering and manipulations but the ability to use the right hand to assist the left hand.  (Tr. 465-66.)  Mr. Meola opined that an individual with these characteristics could not perform Plaintiff's former jobs.  (Tr. 466.)  ALJ Friedman then asked Mr. Meola to determine whether a person would be able to perform other jobs, assuming that the individual had the same abilities as previously mentioned, plus the need to avoid climbing ropes, ladders, and scaffolds.  (Id.)  Mr. Meola opined that the individual could perform jobs such as garment sorter, parts inspector, scaling machine operator, inside messenger, and sorter.  (Id.)  Mr. Meola testified that there were 1,400 jobs in the region, and over 35,000 jobs in the national economy of this type.  (Id.)

Mr. Meola testified that if a person had difficulty maintaining concentration, persistence and pace in simple, routine jobs due to depression or side effects of medications or pain, that individual would be unable to perform a job as a garment sorter, parts inspector, scaling machine

operator, inside messenger and sorter, and any other jobs that exist in significant numbers in the

economy.  (Tr. 467.)  He also stated that if an individual, with the above hypothetical

characteristics, had a moderate limitation to complete a normal workweek and workday without

interruptions from psychologically based symptoms and to perform at a consistent pace without

an unreasonable number and length of rest periods, that the individual would not be able to

perform the above stated jobs.  (Tr. 468.)

## III. DISCUSSION

**A.**     **Standard of Review**

This Court has jurisdiction to review the Commissioner's decision, pursuant to 42 U.S.C.

§ 405(g).  This Court must affirm the Commissioner's decision if it is "supported by substantial

evidence."  42 U.S.C. §§ 405(g), 1383(c)(3); Stunkard v. Sec'y of Health and Human Services,

841 F.2d 57, 59 (3d Cir. 1988); Doak v. Heckler, 790 F.2d 26, 28 (3d Cir. 1986).  Substantial

evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a

conclusion."  Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consol. Edison Co. v.

NLRB, 305 U.S. 197, 229 (1938)).  Substantial evidence "is more than a mere scintilla of

evidence but may be less than a preponderance."  Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir.

1988) (citing Stunkard, 841 F.2d at 59).  The reviewing court must consider the totality of the

evidence and then determine whether there is substantial evidence to support the Commissioner's

decision.  See Taybron v. Harris, 667 F.2d 412, 413 (3d Cir. 1981).  Furthermore, the reviewing

court is not "empowered to weigh the evidence or substitute its conclusions for those of the fact-

finder."  Williams v. Sullivan, 970 F.2d 1178, 1182 (3d Cir. 1992), cert. denied, 507 U.S. 924

(1993) (citing Early v. Heckler, 743 F.2d 1002, 1007 (3d Cir. 1984)).

15

In determining whether there is substantial evidence to support the Commissioner's decision, the reviewing court must consider: "(1) the objective medical facts; (2) the diagnoses and expert opinions of treating and examining physicians on subsidiary questions of fact; (3) subjective evidence of pain testified to by the claimant and corroborated by family and neighbors; (4) the claimant's educational background, work history and present age." Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1973); Curtin v. Harris, 508 F. Supp. 791, 793 (D.N.J. 1981). Where there is substantial evidence to support the Commissioner's decision, it is of no consequence that the record contains evidence which may also support a different conclusion. Blalock, 483 F.2d at 775.

**B.    Statutory Standards**

The claimant bears the initial burden of establishing his or her disability.  42 U.S.C. § 423(d)(5).  To qualify for DIB or SSI benefits, a claimant must first establish that he is needy and aged, blind, or "disabled."  42 U.S.C. § 1381.  A claimant is deemed "disabled" under the Act if he is unable to "engage in substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of no less than [twelve] months."  42 U.S.C. § 423(d)(1)(A); see also Kangas v. Bowen, 823 F.2d 775, 777 (3d Cir. 1987).  Disability is predicated on whether a claimant's impairment is so severe that he "is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A); see also Nance v. Barnhart, 194 F. Supp. 2d 302, 316 (D. Del. 2002).  Finally, while subjective complaints of pain are considered, alone, they are not enough to establish disability.  42 U.S.C. § 423(d)(5)(A).  An impairment only qualifies as a disability if it "results

16

from anatomical, physiological or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3).

**C.**    **The Five Step Evaluation Process and the Burden of Proof**

Determinations of disability are made by the Commissioner, pursuant to the five-step process outlined in 20 C.F.R. § 404.1520. At the first step of the review, the Commissioner must determine whether the claimant is currently engaged in substantial gainful activity. 20 C.F.R. § 404.1520(b). If a claimant is found to be engaged in such activity, the claimant is not "disabled" and the disability claim will be denied. Id.; Bowen v. Yuckert, 482 U.S. 137, 141 (1987).

At step two, the Commissioner must determine whether the claimant suffers from a severe impairment. 20 C.F.R. § 404.1520(a)(ii)(c). An impairment is severe if it "significantly limits [a claimant's] physical or mental ability to do basic work activities." Id. In determining whether the claimant has a severe impairment, the age, education, and work experience of the claimant will not be considered. See id. If the claimant is found to have a severe impairment, the Commissioner addresses step three of the process.

At step three, the Commissioner compares the medical evidence of the claimant's impairment(s) with the impairments presumed severe enough to preclude any gainful work, listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. See 20 C.F.R. § 404.1594(f)(2). If the claimant's impairment(s) meets or equals one of the listed impairments, he will be found disabled under the Social Security Act. If the claimant does not suffer from a listed impairment or its equivalent, the analysis proceeds to steps four and five.

In Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 119-20, 120 n.2 (3d Cir. 2000), the

Third Circuit found that to deny a claim at step three, the ALJ must specify which listings[22] apply and give reasons why those listings are not met or equaled.  In Jones v. Barnhart, 364 F.3d 501, 505 (3d Cir. 2004), however, the Third Circuit noted that "Burnett does not require the ALJ to use particular language or adhere to a particular format in conducting his analysis.  Rather, the function of Burnett is to ensure that there is sufficient development of the record and explanation of findings to permit meaningful review."  Id.  An ALJ satisfies this standard by "clearly evaluating the available medical evidence in the record and then setting forth that evaluation in an opinion, even where the ALJ did not identify or analyze the most relevant listing."  Scatorchia v. Comm'r of Soc. Sec., 137 F. App'x 468, 471 (3d Cir. 2005).

Step four requires the ALJ to consider whether the claimant retains the residual functional capacity to perform his past relevant work.  20 C.F.R. § 404.1520(e).  If the claimant is able to perform his past relevant work, he will not be found disabled under the Act.  In Burnett, the Third Circuit set forth the analysis at step four:

> In step four, the ALJ must determine whether a claimant's residual functional capacity enables her to perform her past relevant work. This step involves three substeps: (1) the ALJ must make specific findings of fact as to the claimant's residual functional capacity; (2) the ALJ must make findings of the physical and mental demands of the claimant's past relevant work; and (3) the ALJ must compare the residual functional capacity to the past relevant work to determine whether claimant has the level of capability needed to perform the past relevant work.

Burnett, 220 F.3d at 120.  If the claimant is unable to resume his past work, and his condition is deemed "severe," yet not listed, the evaluation moves to the final step.

At the fifth step, the burden of production shifts to the Commissioner, who must

---

[22] Hereinafter "listing" refers to the list of severe impairments as found in 20 C.F.R. Part 404, Subpart P, Appendix 1.

demonstrate that there are other jobs existing in significant numbers in the national economy which the claimant can perform, consistent with his medical impairments, age, education, past work experience, and residual functional capacity.  20 C.F.R. § 404.1560(c)(1).  If the ALJ finds a significant number of jobs that the claimant can perform, claimant will not be found disabled. Id.

When the claimant has only exertional limitations, the Commissioner may utilize the Medical-Vocational Guidelines found in 20 C.F.R. Part 404, Subpart P, Appendix 2 to meet the burden of establishing the existence of jobs in the national economy.  These guidelines dictate a result of "disabled" or "not disabled" according to combinations of vocational factors, such as age, education level, work history, and residual functional capacity.  These guidelines reflect the administrative notice taken of the jobs in the national economy that exist for particular combinations of vocational factors.  20 C.F.R. Part 404, Subpart P, Appendix 2, Paragraph 200.00(b).  When a claimant's vocational factors, as determined in the preceding steps of the evaluation, coincide with a combination listed in Appendix 2, the guideline directs a conclusion as to whether an individual is disabled.  20 C.F.R. § 404.1569; Heckler v. Campbell, 461 U.S. 458, 462 (1983).  The claimant may rebut any finding of fact as to a vocational factor.  20 C.F.R. Part 404, Subpart P, Appendix 2, Paragraph 200.00(b).

Additionally, pursuant to 42 U.S.C. § 423(d)(2)(B), the Commissioner "must analyze the cumulative effect of the claimant's impairments in determining whether she is capable of performing work and is not disabled."  Plummer v. Apfel, 186 F.3d 422, 428 (3d Cir. 1999). Moreover, "the combined impact of the impairments will be considered throughout the disability determination process."  42 U.S.C. § 423(d)(2)(B); 20 C.F.R. § 1523; Parker v. Barnhart, 244 F. Supp. 2d 360, 369 (D. Del. 2003).  However, the burden still remains on the Plaintiff to prove

19

that the impairments in combination are severe enough to qualify him for benefits.  See Williams v. Barnhart, 87 F. App'x 240, 243 (3d Cir. 2004) (placing responsibility on the claimant to show how a combination-effects analysis would have resulted in a qualifying disability); see also Marcus v. Barnhart, No. 02-3714, 2003 WL 22016801, at *2 (E.D. Pa. Jun. 10, 2003) (stating that "the burden was on [Plaintiff] to show that the combined effect of her impairments limited one of the basic work abilities").

While Burnett involved a decision in which the ALJ's explanation of his step three determination was so inadequate as to be beyond meaningful judicial review, the Third Circuit applies its procedural requirements, as well as their interpretation in Jones, to every step of the decision.  See, e.g., Rivera v. Commissioner, 164 F. App'x 260, 262 (3d Cir. 2006).  Thus, at every step, "the ALJ's decision must include sufficient evidence and analysis to allow for meaningful judicial review," but need not "adhere to a particular format."  Id.

**D.     ALJ Friedman's Findings**

ALJ Friedman applied the five step evaluation process and determined that Plaintiff was not disabled within the meaning of the Social Security Act.  (Tr. 30.)

*1.     Step One*

Regarding step one, ALJ Friedman found that Plaintiff had "not engaged in any substantial gainful activity since January 15, 2002."  (Tr. 22.)

*2.     Step Two*

With respect to step two, ALJ Friedman found that Plaintiff suffered from status-post injury to the right hand and effective disorders, which are severe impairments within the meaning of the Social Security Act.  (Tr. 22.)

20

### 3.    Step Three

Regarding step three, ALJ Friedman concluded that the "claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR [sic] Part 404, Subpart P, Appendix 1." (Tr. 23.)  ALJ Friedman reasoned that the requirements of Listing 1.00 were not met because there was no evidence of "an extreme loss of function of both upper extremities or lack of major function of the right upper extremity," resulting in "an inability to ambulate effectively or perform fine and/or gross manipulations." (Tr. 23.)  ALJ Friedman found that the medical records also revealed that Plaintiff's impairments "do[] not cause more than a slight abnormality in the claimant's ability to perform basic work activities," as defined in Listing 12.00 (20 C.F.R. Part 404, Subpart P, Appendix 1). (Tr. 23.)

### 4.    Step Four

Under step four, ALJ Friedman concluded that Plaintiff cannot perform any past relevant work as a machine operator/packer/assembler, forklift operator, or escort/security transport driver. (Tr. 28.)  ALJ Friedman determined that Plaintiff's residual functional capacity would allow him "to perform light work involving the lifting and carrying of objects weighing up to twenty pounds; frequently lifting and carrying objects weighing up to ten pounds; standing, walking and sitting up to six hours in an eight hour day; pushing and pulling arm and leg controls with limited use of his dominant hand for fingering and fine manipulation; however, he is able to use his dominant hand to assist his left hand when conducting simple routine jobs in a low contact sitting." (Tr. 23.)

In reaching this conclusion, ALJ Friedman relied on medical reports by Dr. Milazzo, Dr. Friedman, and State Agency medical consultants.  In evaluating Plaintiff's subjective complaints,

ALJ Friedman considered

> (1) The claimant's daily activities; (2) [t]he location, duration, frequency, and intensity of the claimant's pain and other symptoms; (3) [f]actors that precipitate and aggravate the symptoms; (4) [t]he type, dosage, effectiveness, and side effects of any medication the claimant takes or has taken to alleviate pain or other symptoms; (5) [t]reatment, other than medication, the claimant receives or has received for relief of pain or other symptoms; (6) [a]ny measures other than treatment the claimant uses or has used to relieve pain or other symptoms (e.g.,  lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and (7) [a]ny other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms.

(Tr. 26.)

ALJ Friedman determined that "while the medical record established that the claimant's major problem is the large degree of functional loss of use of his right hand due to an injury, the claimant's allegations of complete inability to work due to pain and other limiting symptoms are not supported by the record as a whole."  (Tr. 27.)  ALJ Friedman noted that after Plaintiff's injury in 1994, which required multiple surgeries and an intensive course of supportive therapy, Plaintiff "was given clearance to return to work with limitations of lifting more than thirty pounds and no heavy gripping with the right hand."  (Tr. 24.)

Additionally, ALJ Friedman determined that Drs. Ahmad's and Latimer's reports and assessments were not supported by the entire record, and therefore they were not entitled to significant weight.  (Tr. 27.)  ALJ Friedman specifically noted that Dr. Ahmad and Dr. Latimer generally evaluate individuals for litigation purposes.  (Tr. 27.)  "Their findings and conclusions frequently contain virtually identical wording, often refer to impairments not alleged by the claimant or supported by any medical evidence, and they rarely vary significantly from case to case."  (Tr. 27.)

22

### 5.   *Step Five*

With respect to step five, ALJ Friedman determined that Plaintiff was "not disabled" as defined by Medical-Vocational Rules 201.20/201.21.[23]  (Tr. 29.)  ALJ Friedman concluded that although Plaintiff's medical impairments may have prevented him from engaging in his past relevant work, he is not barred from other substantial gainful activity.  (Tr. 28.)  Considering the Plaintiff's age, education, work experience, and residual functional capacity, ALJ Friedman found that jobs exist in significant numbers that Plaintiff can perform.  (Tr. 28.)  ALJ Friedman used the Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2, and relied on the expert testimony of the vocational expert, Mr. Rocco Meola, to formulate his conclusion. (Tr. 28-30.)  The vocational expert testified that a person with Plaintiff's limitation could work as a garment sorter, parts inspector, scaling machine operator, inside messenger and sorter.  (Tr. 29.) Mr. Meola testified that there are approximately 1,400 such jobs locally, and over 35,000 nationally.  (Tr. 29.)

### E.   <u>Analysis</u>

Plaintiff contends that ALJ Friedman's decision should be reversed and that Plaintiff should be awarded Social Security Disability Insurance Benefits, or, in the alternative, the case should be remanded (Br. on Behalf of Pl. 26 [hereinafter "Pl.'s Br."] ), because the ALJ's decision was not supported by substantial evidence (Pl.'s Br. 23).  Specifically, Plaintiff argues that: (1) ALJ Friedman's vocational analysis was inadequate (Pl.'s Br. 12); and (2) ALJ

---

[23]  This Court notes that ALJ Friedman incorrectly cited to Medical-Vocational Rules 201.27 and 201.28, which correspond to sedentary work, instead of Medical-Vocational Rules 202.20 and 202.21, which correspond to light work.  However, ALJ Friedman's incorrect citation constitutes harmless error because ALJ Friedman correctly applied the standards set forth in Medical-Vocational Rules 201.20 and 201.21 but simply cited the wrong rule.  This Court cites to the applicable rule citations in this opinion.

Friedman's consideration of the Plaintiff's credibility was inadequate (Pl.'s Br. 23).

This Court finds that there is substantial evidence to support ALJ Friedman's determination.

**1.     ALJ Friedman's Vocational Analysis was Supported by Substantial Evidence.**

Plaintiff contends that ALJ Friedman "erred in finding that the plaintiff can do jobs [that] exist in 'significant numbers'."  (Pl.'s Br. 12-23.)  Plaintiff specifically states "that the appropriate hypotheticals [to the vocational expert] yielded the evidence that [ ] [P]laintiff is unable to engage in jobs which exist in significant numbers in the economy."  (Pl.'s Br. 19.) Next, Plaintiff contends "that the ALJ's rejection of the limitations indicated by the State Agency expert is not well-reasoned or substantiated."  (Pl.'s Br. 21.)  Plaintiff also argues that "the evidence does not establish a significant number of jobs [he] can do."  (Pl.'s Br. 22.)

Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938) (citations omitted).  In assessing a claimant's disability, it is a well-established standard that the "ALJ must consider all medical evidence in the record and provide adequate explanations for disregarding or rejecting evidence, especially when the testimony of the claimant's treating physician is rejected."  Clausen v. Chater, 950 F. Supp. 1287, 1292 (D.N.J. 1996) (citing Weir on Behalf of Wier v. Heckler, 734 F.2d 955, 961 (3d Cir. 1984); Cotter v. Harris, 642 F.2d 700 (3d Cir. 1981)).  Based upon the evidence in the record, there is substantial evidence to support ALJ Friedman's vocational findings.

        A.     *The ALJ's Finding That Plaintiff Could Perform a Significant Number of Jobs is Supported by the Record.*

At step five of the analysis, the burden shifts to the Commissioner to prove that Plaintiff

retained the residual functional capacity to perform jobs existing in significant numbers in the

national economy.  See 20 C.F.R. §§ 404.1520(g), 416.920(g).  Where a claimant has a

combination of exertional and nonexertional impairments, the ALJ must first consider whether a

Medical-Vocational Rule directs a conclusion of disability.  20 C.F.R. §§ 404.1569a(d),

416.969a(d).  If not, "the rule(s) reflecting the individual's maximum residual strength

capabilities, age, education, and work experience provide a framework for consideration of how

much the individual's work capability is further diminished in terms of any types of jobs that

would be contraindicated by the nonexertional limitations."  20 C.F.R. Pt. 404, Subpt. P, App. 2

§ 200.00; see Sykes v. Apfel, 228 F.3d 259 (3d Cir. 2000).

Having concluded that Plaintiff could not return to past relevant work, ALJ Friedman,

relying on vocational expert testimony,[24] found that Plaintiff could perform jobs existing in

significant numbers in the economy.  (Tr. 28.)  In making this determination, ALJ Friedman

considered Plaintiff's residual functional capacity, age, education, and past work experience.

---

[24] According to S.S.R. 00-4p, "when a VE [vocational expert] or VS [vocational specialist] provides evidence about the requirements of a job or occupation, the adjudicator has an affirmative responsibility to ask about any possible conflict between that VE or VS evidence and information provided in the DOT [Dictionary of Occupational Titles]."  Use of Vocational Expert and Vocational Specialist Evidence, and Other Reliable Occupational Information in Disability Decisions, S.S.R. 00-4p (2000).  "In these situations, the adjudicator will: 1) [a]sk the VE or VS if the evidence he or she has provided conflicts with the information provided in the DOT; and 2) [i]f the VE's or VS's evidence appears to conflict with the DOT, the adjudicator will obtain a reasonable explanation for the apparent conflict."  Id.

Here, ALJ Friedman asked the vocational expert hypothetical questions, and the vocational expert identified approximately 1,400 jobs Plaintiff could perform in Northern New Jersey and over 35,000 jobs nationally.  (Tr. 466.)  As required under S.S.R. 00-4p, ALJ Friedman specifically asked the vocational expert whether the jobs he identified were consistent with the information contained in the DOT.  (Tr. 468.)  Because nothing in the record raised the possibility that the vocational expert's testimony conflicted with the DOT, ALJ Friedman complied with the requirements of the Ruling and was entitled to rely on the vocational expert's testimony.

(Tr. 28.)  ALJ Friedman determined that Plaintiff had a high school equivalent education.  (Tr. 18.)  ALJ Friedman found that Plaintiff, who was 39 years old at the time of the application, was a younger individual, as defined in 20 C.F.R. §§ 404.1563, 416.963.  (Tr. 28.)  Plaintiff's past relevant work was "light to medium and unskilled to skilled."  (Tr. 29.)  However, because Plaintiff's ability to perform all or substantially all of the requirements of this level of work has been impeded by additional non-extertional limitations, the ALJ relied upon the testimony of the vocational expert to find that Plaintiff was not disabled.  (Tr. 29-30.)  Given these vocational factors, together with a residual functional capacity to perform a full range of light work, the ALJ used Medical-Vocational Rules 202.20/202.21 as a framework to find that Plaintiff was not disabled and could perform "work that exists in significant numbers in the national economy."  (Tr. 29-30.)

The regulations provide that a vocational expert may provide reliable evidence regarding the existence of jobs in the national economy that a claimant with particular functional limitations could perform.  20 C.F.R. §§ 404.1566, 416.966.  A court does not require an ALJ to submit to the vocational expert every impairment alleged by a claimant.  Rutherford v. Barnhart, 399 F.3d 546, 554 (3d Cir. 2005).  Rather, "the hypotheticals posed must 'accurately portray' the claimant's impairments and [ ] the expert must be given an opportunity to evaluate those impairments as contained in the record."  Id.

Here, the ALJ presented several hypotheticals to Mr. Meola, the vocational expert.  (Tr. 463-468.)  ALJ Friedman asked Mr. Meola to determine hypothetically whether a person would be able to perform Plaintiff's past relevant work, assuming that an individual of Plaintiff's age, education, and past relevant experience could perform simple, routine, low contact light work, with limited use of his right hand for fingering and manipulations, but the ability to use the right

hand to assist the left hand.  (Tr. 465-66.)  Mr. Meola opined that an individual with these characteristics could not perform Plaintiff's former jobs.  (Tr. 466.)  ALJ Friedman then asked Mr. Meola to determine whether a person would be able to perform other jobs assuming that the individual had the same abilities as previously mentioned, plus the need to avoid climbing ropes, ladders and scaffolds.  (Tr. 466.)  Mr. Meola opined that the individual could perform jobs such as garment sorter, parts inspector, scaling machine operator... inside messenger and sorter.  (Tr. 466.)  Mr. Meola testified that there were 1,400 jobs in the region and over 35,000 jobs in the national economy of this type.  (Tr. 466.)

Plaintiff argues "that the appropriate hypotheticals yielded [ ] evidence that the plaintiff is unable to engage in jobs which exist in significant numbers in the economy."[25]  (Pl.'s Br. 19.) "When a conflict of evidence exists, the ALJ may choose whom to credit, but cannot reject evidence for no reason or for the wrong reason."  Mason, 994 F.2d at 1066.

In this case, ALJ Friedman did not overlook the vocational expert's testimonial responses elicited during Plaintiff's examination.  Here, as in Craigie v. Bowen, the vocational expert's opinions were based on findings included in the hypothetical that the ALJ did not find credible or persuasive in light of the other evidence in the medical record.  See Craigie v. Bowen, 835 F.2d 56, 57 (3d Cir. 1987).  "Inasmuch as the administrative law judge did not have to accept [a claimant's] testimony, he did not have to credit the expert testimony that was predicated upon it." Id.

_____

[25] The hypotheticals that Plaintiff mentions refer to the testimony of the vocational expert in response to Plaintiff's attorney's hypothetical questions.  The hypothetical questions were based on the moderate limitations for mental capacity delineated by Dr. Benito Tan, a State Agency review expert.  Ultimately, the ALJ did not conclude that Plaintiff's mental limitations were as severe as those reflected in Dr.Tan's assessment reports, and those presented in the Plaintiff's counsel's hypotheticals at the hearing.

In this case, the vocational expert's opinions in response to Plaintiff's hypotheticals were inconsistent with the medical evidence and the ALJ's findings based on that evidence.  Mr. Meola opined that an individual would be unable to engage in jobs such as "a garment sorter, parts inspector, scaling machine operator, inside messenger, and sorter if that person had due to depression or side effects of medications or pain, if the person would have difficulty maintaining concentration, persistence and pace on attention and concentration on simple, routine jobs."  (Tr. 466-67.)  Mr. Meola opined that an individual would be unable to engage in jobs which exist in significant numbers in the economy, if he or she had a moderate limitation to complete a normal work week and work day without interruptions from psychologically based symptoms, and to perform at a consistent pace without an unreasonable number and length of rest periods.  (Tr. 468.)  Mr. Meola also opined that an individual would be unable to engage in jobs which exist in significant numbers in the economy if he or she had a moderate limitation in the ability to accept instructions and to respond appropriately to criticism from supervisors.  (Id.)

No medical evidence indicates that Plaintiff would have difficulty "maintaining concentration, persistence or pace."  (See Pl.'s Br. 20.)  Instead, the medical evidence demonstrates, and ALJ Friedman found, that Plaintiff had only minor impairments.  For example, Dr. Tan noted that Plaintiff's concentration was mildly impaired.  (Tr. 390.)  Dr. Tan also determined that Plaintiff "can understand and remember instructions, can maintain cpp[,][26] and maintain appropriate social interaction and adapt to work."  (Tr. 390.)

Based on this evidence, ALJ Friedman concludes that, "[g]iven the fact that [Dr. Tan] noted that [Plaintiff] had only mild limitation of his attention and concentration, interpreting the

---

[26] CCP stands for concentration, persistence, and pace.  (See Tr. 29.)

'moderate' checkbox in attention and concentration as establishing a disabling impairment would be illogical and obviously inconsistent with the state agency assessment." (Tr. 29 (emphasis in original).)

When there is a conflict of evidence, the ALJ may choose whom to credit. See Mason, 994 F.2d at 1066. Since Dr. Tan's assessment of Plaintiff and Mr. Meola's responses to Plaintiff's hypothetical questions were inconsistent, ALJ Friedman could reject and ignore the vocational expert's responses based on hypothetical questions that presumed the findings he rejected. ALJ Friedman fully explained his reasoning for not using part of the vocational expert's testimony. (Tr. 29.) When expert testimony is not based upon well established evidence, but instead on allegations rejected by the ALJ, it shall not form the basis for the ALJ's findings. See Craigie, 835 F.2d at 57. Accordingly, Mr. Meola's testimony constituted substantial evidence to support the ALJ's determination that there was a significant number of jobs in the national economy that Plaintiff could perform.

### B.     The ALJ Adequately Considered the Medical Evidence in the Record.

Plaintiff contends that ALJ Friedman's rejection of the limitations indicated by the State Agency expert was not well-reasoned or substantiated. (Pl.'s Br. 20-21.) Plaintiff specifically argues that ALJ Friedman did not consider Plaintiff's moderate limitations of functioning (Pl.'s Br. 20), as evidenced by Dr. Benito Tan's psychiatric assessment (Tr. 376-90).

When reviewing the Commissioner's findings, this Court must consider the totality of the evidence, and then determine whether there is substantial evidence to support the Commissioner's decision. See Taybron v. Harris, 667 F.2d 412, 413 (3d Cir. 1981). In determining whether there is substantial evidence to support the Commissioner's decision, the reviewing court must consider, inter alia, "(1) the objective medical facts; and (2) the diagnoses

29

and expert opinions of treating and examining physicians on subsidiary questions of fact."
Curtin v. Harris, 508 F. Supp 791, 793 (D.N.J. 1981).

Moreover, "administrative law judges must consider findings of State agency medical and psychological consultants or other program physicians and psychologists as opinion evidence . . . ." 20 C.F.R. § 404.1527(f)(2)(i)(2008). The ALJ considers a state agency consultant's findings in conjunction with "the supporting evidence in the case record." Id. Additionally, the regulations specify that ALJs are not bound by the medical assessments of State agency medical consultants. 20 C.F.R. §§ 404.1527(f)(2)(i), 416.927(f)(2)(i).

Here, contrary to Plaintiff's assertion, ALJ Friedman adequately considered Dr. Tan's report. (Tr. 27.) Even though the ALJ was not bound by this report, the ALJ noted that "the assessments of the State Agency medical consultants . . . who found that the claimant could perform light work with limited use of the right hand to assist, limited fingering with the right hand, etc . . . is a fair assessment of the credible evidence in the record and [is] entitled to great weight." (Tr. 27.) Additionally, ALJ Friedman agreed with Dr. Tan's assessment that Plaintiff "could understand and remember instructions, maintain concentration, persistence and pace and maintain appropriate social interactions and adapt to work . . . ." (Id.) ALJ Friedman stated that these findings were consistent with the evidence including treating records from St. Michaels Mental Health Clinic and Dr. Friedman. (Id.) As discussed above with respect to the vocational findings, ALJ Friedman explained his reasons for rejecting Dr. Tan's selection of moderate limitations to describe Plaintiff's attention and concentration in the Mental Residual Functional Capacity Assessment (MRFCA). (See Tr. 29.)

Plaintiff also argues that the ALJ inadequately considered the records of the treating sources from East Orange General Mental Health Center and Dr. Marc Friedman's examination.

(Pl's. Br. 21.)  However, this argument is without merit because ALJ Friedman discusses these findings in detail.  (Tr. 25-27.)  ALJ Friedman discussed and considered the evidence from East Orange General Mental Health Center by noting Plaintiff's diagnosis of bipolar disorder, his GAF score of 50, and his treatment of psychotherapy and psychotropic medications.  (Tr. 26.)  ALJ Friedman also relied on Dr. Friedman's findings that Plaintiff suffers from major depressive disorder, has a GAF score of 50, and is depressed due to his inability to find a job.  (Tr. 27.)  Not only did ALJ Friedman cite to this evidence, he carefully explained his credibility findings and the reasons that he attributed more weight to the reports of Dr. Friedman, the records from St. Michael's Hospital, and the DDS expert than to the reports of other medical experts.  (See Tr. 27-28.)

Based on this analysis, this Court finds that the ALJ adequately considered the findings reported by the State Agency expert, the East Orange General Mental Health Center, and Dr. Marc Friedman.

C.      The Evidence in the Record Establishes a Significant Number of Jobs Plaintiff Can do.

Plaintiff argues that "even if all the [P]laintiff's mental limitations were adequately considered[,] the record does not supply substantial evidence that there are a 'significant' number of jobs in the economy which the plaintiff can do."  (Pl.'s Br. 22.)  Specifically, Plaintiff argues that the vocational expert testified that Plaintiff can do 1,400 out of eight million jobs in Northern New Jersey and 35,000 out of 135 million jobs nationally.  (Pl.'s Br. 22.)  Plaintiff contends that ALJ Friedman's decision is not supported by substantial evidence because he provided no explanation as to how a factor of .01 percent can be considered significant.  (Pl.'s Br. 22.)  However, Plaintiff's argument is without merit.

31

The Code of Federal Regulations provide that a vocational expert may provide reliable evidence regarding the existence of jobs in the national economy that a claimant with particular functional limitations could perform.  See 20 C.F.R. §§ 404.1566, 416.966.  "Work exists in the national economy when there is a significant number of jobs (in one or more occupations) having requirements which you are able to meet with your physical or mental abilities and vocational qualifications."  20 C.F.R. § 404.1566.  "Isolated jobs that exist only in very limited numbers in relatively few locations outside of the region where you live are not considered work which exists in the national economy."  Id.

In determining whether work exists in significant numbers, some courts have adopted the standards set forth in Hall v. Bowen, 837 F.2d 272 (6th Cir. 1988).[27]  In Hall, the court said that "we cannot set forth one special number which is to be the boundary between a 'significant number' and an insignificant number of jobs."  Id. at 275.  A judge should view any number provided in the context of the particular case and should consider many criteria, including, but not limited to, the level of claimant's disability, the reliability of vocational expert and claimant's testimony, the distance the claimant is capable of traveling, the isolated nature of the jobs, the types and availability of such work.  Id.  "The decision should ultimately be left to the trial judge's common sense in weighing the statutory language as applied to a particular claimant's factual situation."  Id.

Here, Plaintiff's argument rests on the small percentage of the total number of jobs

---

[27] See, e.g., Jenkins v. Bowen, 861 F.2d 1083, 1087 (8th Cir. 1988) (applying the factors in Hall v. Bowen, the court determined that 500 jobs located in the Missouri region constitutes a significant number of jobs); Trimiar v. Sullivan, 966 F.2d 1326, 1330 (10th Cir. 1992) (applying the factors in Hall v. Bowen, the court determined that 650 to 900 jobs in the State of Oklahoma constitutes a significant number of jobs).

available to Plaintiff in Northern New Jersey and nationally.  However, when testimony is

provided "that a significant number of jobs exists for which a claimant is qualified, it is

immaterial that this number is a small percentage of the total number of jobs in a given area."

Hall v. Bowen, 837 F.2d 272, 275 (6th Cir. 1988) (citing Walker v. Matthews, 546 F.2d 814, 819

(9th Cir. 1976)).  Therefore, based on the information in the entire record, including testimony

from a vocational expert, this Court concludes that 1,400 jobs in Northern New Jersey is a

significant number.  As such, ALJ Friedman's determination that Plaintiff could perform a

significant number of jobs is supported by substantial evidence.

### 2.   ALJ Friedman's Consideration of the Plaintiff's Credibility Was Supported by Substantial Evidence and Should Be Affirmed.

Plaintiff contends that ALJ Friedman's finding that "[Plaintiff's] medically determinable

impairments could reasonably be expected to produce the alleged symptoms, but that the

[plaintiff's] statements concerning the intensity, persistence and limiting effects of these

symptoms are not entirely credible" was an inadequate assessment of Plaintiff's credibility

because of a lack of specificity.  (Pl.'s Br. 23-24.)  Plaintiff noted that the "Social Security

Ruling (SSR) 96-7p, mandates that the ALJ's[] [d]ecision must contain specific reasons for the

credibility finding, supported by evidence in the record and must specifically state the weight

given to the individuals's statements."  (Pl.'s Br. 23-24.)

"An ALJ must consider a claimant's subjective symptoms, including pain, and may not

discount those symptoms if they are reasonably consistent with the objective medical evidence

and other evidence in the record."  Chrupcala v. Heckler, 829 F.2d 1269, 1275-76 (3d Cir. 1987);

20 C.F.R. § 404.1529 (2008).  "It is the ALJ's responsibility to resolve conflicts in the evidence

and to determine credibility and the relative weights to give to the evidence."  Plummer,186 F.3d

at 429; <u>Mason v. Shalala</u>, 994 F.2d 1058, 1066 (3d Cir. 1993).  A plaintiff "'bears the burden of demonstrating that [his/her] complaints were substantiated by medical evidence.'"  <u>Person v. Barnhart</u>, 380 F. Supp. 2d 496, 508 (D.N.J. 2005) (quoting <u>Alexander v. Shalala</u>, 927 F. Supp. 785, 795 (D.N.J. 1995), <u>aff'd per curiam</u> 85 F.3d 611 (3d Cir. 1996)).  A plaintiff's "subjective complaints of pain will not be conclusive evidence of disability absent objective medical evidence that demonstrates the existence of [the] medical impairment."  20 C.F.R. § 416.929(a); <u>Hartranft v. Apfel</u>, 181 F.3d 358, 362 (3d Cir. 1999).

In addition, an ALJ is not "require[d] . . . [to] mention[ ] every item of testimony presented to him or [ ] explain[ ] why he considered particular evidence unpersuasive or insufficient to lead him to a conclusion of disability."  <u>Mongeur v. Heckler</u>, 722 F.2d 1033, 1040 (2d Cir. 1983); <u>Blowers v. Astrue</u>, No. 05-557, 2008 U.S. Dist. LEXIS 10373, at *19 (N.D.N.Y. Feb. 12, 2008).  "A reviewing court typically defers to an ALJ's credibility determination so long as there is a sufficient basis for the ALJ's decision . . . ."  <u>Izzo v. Comm'r of Soc. Sec.</u>, 186 F. App'x 280, 286 (3d Cir. 2006) (citing <u>Reefer v. Barnhart</u>, 326 F.3d 376, 380 (3d Cir. 2003)).  Accordingly, an ALJ's "credibility determinations are entitled to great deference and should not be discarded lightly."  <u>Reefer</u>, 326 F.3d at 380.

ALJ Friedman considered Plaintiff's testimony and the medical evidence, and concluded that "[w]hile the medical record establishes that the claimant's major problem is the large degree of functional loss of use of his right hand due to an injury, the claimant's allegations of complete inability to work due to pain and other limiting symptoms are not supported by the record as a whole."  (Tr. 27.)  Plaintiff testified at the hearing that he is unable to work because the injury to his right hand "led to other problems with [his] body and [] focus."  (Tr. 442.)  Plaintiff also complained of continuing back problems.  (Tr. 450-51.)

34

However, medical evidence exists in the record that supports ALJ Friedman's determination.  For example, on June 22, 2004, Dr. Salvatore Milazzo's examination revealed that Plaintiff had no appreciable paraspinal muscular tightness or complaints of pain palpation of the cervical spine and the thorocolumbar spine.  (Tr. 350.)  Dr. Milazzo also noted that Plaintiff had no "tenderness over the gluteal musculature, sciatic notches or sacroiliac joints."  (Id.)  A radiographic examination of Plaintiff's right hand showed that the bones were in good alignment, there were mild arthritic changes, and there were no acute fractures or dislocation.  (Tr. 352.)

Additionally, a physical examination of Plaintiff on June 28, 2004, at the Mountainside Hospital, showed that Plaintiff's old injuries in the right hand were healed without signs of infection, and there was minimal tenderness in the spine.  (Tr. 357.)  Additionally, on June 8, 2006, at East Orange General Hospital, Plaintiff did not report any physical pain.  (Tr. 402.)

Plaintiff also complained that anxiety, nervousness, depression, low energy, inability to socialize, and uselessness affects his ability to do any job.  (Tr. 441-42, 448, 451-53.)  However, contrary to Plaintiff's contention, medical evidence shows that he is able to adapt to work.  According to Dr. Benito Tan's assessment, Plaintiff  "could understand and remember instructions, maintain concentration, persistence and pace and maintain appropriate social interactions and adapt to work . . . ."  (Tr. 390.)  This evidence is also consistent with treating records from St. Michael's Mental Health Clinic and medical reports from Dr. Friedman.

Based on this evidence, this Court concludes that evidence exists in the record to support ALJ Friedman's evaluation of the credibility of Plaintiff's complaints and testimony.

## IV. <u>CONCLUSION</u>

For the reasons stated above, this Court finds that Commissioner's decision is supported by substantial evidence and is affirmed.


      S/Joseph A. Greenaway, Jr.            
JOSEPH A. GREENAWAY, JR., U.S.D.J.

Date: September 19, 2008